# CASE NO. 24-5502
# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

**LARRY SMITH,**

**Appellant**

**v.**

**NEWPORT UTILITIES,**

**Appellee.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### Case No. 2:22-cv-00112

---

### BRIEF OF APPELLEE, NEWPORT UTILITIES

---

Mark E. Stamelos (TN 021021)
Paige M. Lyle (TN 032959)
FORDHARRISON LLP
150 3RD Avenue South
Suite 2010
Nashville, Tennessee 37201
Telephone: (615) 574-6700
mstamelos@fordharrison.com
plyle@fordharrison.com

Attorneys for Appellee

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS<br>AND FINANCIAL INTEREST</u>

Pursuant to Rule 26.01 of the Sixth Circuit Court of Appeals, Appellee, Newport Utilities, makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

   No.

2. Is there a publicly owned corporation, not a party to the appeal, which has a financial interest in the outcome?

   No.

/s/ Paige M. Lyle

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant has requested oral argument before this Court. Appellee believes that the record before this Court is sufficient to affirm the decision of the District Court and that oral argument is unnecessary for this matter.

# TABLE OF CONTENTS

Page

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL
INTEREST ........................................................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS ....................................................................... iii

TABLE OF AUTHORITIES ...................................................................... v

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 1

    A.    Plaintiff's Employment with Newport is Inherently Dangerous and
        Unpredictable .............................................................................. 1

    B.    Plaintiff Suffers from an Unpredictable Seizure Condition that
        Threatened the Safety of Himself and Others at Work ...................... 4

    C.    Concerned about Plaintiff's Ability to Safely Perform His Job,
        Newport Refers Him to a Fitness for Duty Examination ................... 6

    D.    Plaintiff Applies For and Is Granted Long-Term Disability
        Benefits .................................................................................... 9

    E.    Plaintiff's Medical Providers Determine He Cannot Perform the
        Essential Functions of His Job ..................................................... 11

    F.    Newport Cannot Reasonably Accommodate Plaintiff's
        Restrictions and He Retires .......................................................... 12

    G.    Plaintiff Continues to Suffer from Unpredictable Seizures Even
        Since his Retirement ................................................................... 13

SUMMARY OF THE ARGUMENT ........................................................... 13

ARGUMENT ...................................................................................... 15

    A.    The District Court Appropriately Concluded that Plaintiff Posed
        a Direct Threat of Harm to Himself and Others ............................ 15

    B.    Newport Could Not Reasonably Accommodate Plaintiff's
        Restrictions .............................................................................. 22

    C.    Newport Engaged in a Sufficient Interactive Process ...................... 28

CONCLUSION .................................................................................................... 30

CERTIFICATE OF COMPLIANCE .................................................................. 31

CERTIFICATE OF SERVICE ............................................................................ 32

ADDENDUM ....................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Bradley v. Univ. of Tex. M.D. Anderson Cancer Ctr.,* 3 F.3d 922, 924 (5th Cir.1993)........................................................................................................ 15

*Bragdon v. Abbott,* 524 U.S. 624, 650 (1998)........................................................ 17

*Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 634 (6th Cir.1998) ......................... 27

*Darnell v. Thermafiber, Inc.,* 417 F.3d 657, 660-62 (7th Cir. 2005)...................... 18

*Doe v. Univ. of Md. Med. Sys.,* 50 F.3d 1261, 1266 (6th Cir. 1995) ...................... 15

*E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 762 (6th Cir. 2015) ........................... 24

*Est. of Mauro By & Through Mauro v. Borgess Med. Ctr.,* 137 F.3d 398 (6th Cir. 1998)........................................................................................................ 16, 19

*Holiday v. City of Chattanooga,* 206 F.3d 637, 643, 648 n. 4 (6th Cir. 2000)....... 16

*Hutton v. Elf Atochem North America, Inc.,* 273 F.3d 884, 886–87, 891-94 (9th Cir. 2001) ......................................................................................... 17, 18, 19

*Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) .............................. 28

*Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 870 (6th Cir. 2007) .......... 23, 26

*Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447–48 (11th Cir. 1996), cert. denied, 519 U.S. 1118 (1997) ....................................................................... 17

*Rorrer v. City of Stow,* 743 F.3d 1025, 1038, 1045 (6th Cir. 2014) ................. 23, 28

*Wurzel v. Whirlpool Corp.,* 482 F. App'x 1, 12–13 (6th Cir. 2012)................. 17, 20

**Statutes, Rules, Constitutional Provisions**

42 U.S.C. § 12111(3) ............................................................................................. 16

42 U.S.C. § 12111(8) ................................................................. 23, 24

42 U.S.C. § 12111(9)(B) ................................................................. 28

42 U.S.C. § 12112(a) ................................................................. 22

42 U.S.C. § 12112(b)(5)(A) ................................................................. 23

29 C.F.R. § 1630.2(n)(1) ................................................................. 24

29 C.F.R. § 1630.2(n)(2) ................................................................. 24

29 C.F.R. § 1630.2(n)(3)(iii)-(vii) ................................................................. 24

29 C.F.R. § 1630.2(o) ................................................................. 23

29 C.F.R. § 1630.2(r) ................................................................. 16, 17, 19

Fed. R. App. P. 32(a)(7)(C) ................................................................. 31

6th Cir. R. 26.01 ................................................................. i

6th Cir. R. 28(b) ................................................................. 33

6th Cir. R. 32(a)(4)-(6) ................................................................. 31

## STATEMENT OF THE ISSUES

Appellant has raised four issues on appeal. The sole dispositive issue for this Court is whether the District Court erred in granting summary judgment to Appellee after concluding that Plaintiff posed a direct threat to himself or others in the workplace that could not be accommodated.

## STATEMENT OF THE CASE

### A.    Plaintiff's[1] Employment with Newport is Inherently Dangerous and Unpredictable.

Plaintiff began work with the Electrical Division of Newport Utilities in August 1988. (Plaintiff Dep., RE 17-1, Page ID # 104). He began his employment in the stock room and worked his way through the ranks over 20 years from groundsman, to journeyman, to bucket foreman. (Plaintiff Dep., RE 17-1, Page ID # 105-106, 113; Frisbee Dep., RE 17-2, Page ID # 193). Each of these steps required extensive training, certification, and apprenticeship. (*Id.*).

In September 2014, Plaintiff was promoted to become one of only three bucket foremen. (Frisbee Dep., RE 17-2, Page ID # 195).  In this role, Plaintiff worked on a two-person "small bucket truck" team, supervising and working with another less experienced lineman. (Plaintiff Dep., RE 17-1, Page ID # 117, 118; Woods Dep., RE 17-3, Page ID # 239). Plaintiff's assigned truck was one of only

---

[1] To avoid confusion from the lower court record, the parties are referred to as Plaintiff and Defendant rather than Appellant and Appellee.

two small bucket truck teams utilized at Newport. (Plaintiff Dep., RE 17-1, Page ID # 111). Each employee assigned to a service truck was required to possess a valid CDL license. (*Id*.). While only one employee at a time can drive the truck, each must possess a license for safety reasons. That is, if one of the men on a two-man team suffers an emergency, the other must be available to drive them to treatment or safety. (Frisbee Dep., RE 17-2, Page ID # 194). Each day, a bucket truck team was given a daily list of job tasks to complete. (Woods Dep., RE 17-3, Page ID #239). Additionally, each team had to be available to respond to emergent situations and/or assist with power outages or other hazardous conditions. (*Id*.; Plaintiff Dep., RE 17-1, Page ID # 120).

All lineman-related positions, including the bucket foremen, provide service and power to the community and restore power in case of outages. These positions are inherently dangerous and require utilizing significant tools and working around and with live powerlines. (Plaintiff. Dep., RE 17-1, Page ID # 114, 138-141). In many instances, linemen work in lightning storms or other dangerous weather events. Linemen risk electrocution, explosions, breakages, and other conditions that can cause serious injury or death. (Plaintiff Dep., RE 17-1, Page ID #115-116). Linemen are required to scale powerlines and operate at great heights, working with live electricity in stressful situations. (Plaintiff Dep., RE 17-1, Page ID # 138-141). Due to the nature of this work, it is <u>vitally</u> important that employees are alert and

aware, and always give their full attention to the events around them. (Plaintiff Dep., RE 171-1, Page ID # 116, 138-141).

During Plaintiff's employment, the schedule for a bucket foreman during a two-week period was 36 hours the first week and 44 hours the second week.[2] (Woods Dep., RE 17-3, Page ID # 238). However, each lineman could be called in to work *any time* there was a power outage or other emergency.  (Plaintiff Dep., RE 17-1, Page ID # 120, 138-141). This could cause linemen to work extended hours during the day or overtime during the two weeks.  Finally, Plaintiff, and others in his department, were required to be available to perform "standby" work, meaning they would be "on call" during a scheduled period to handle after-hour emergency call-ins.

The standby shift was from 5:00 p.m. to 7:15 a.m. the following day and continued for one full week. (Woods Dep., RE 17-3, Page ID #240; Plaintiff Dep., RE 17-1, Page ID # 106). As a bucket foreman specifically, Plaintiff worked standby approximately every six weeks. (*Id*.). At the start of each year, a schedule is created where each employee subject to standby work is given "scheduled overtime" each five to six weeks, for one full week. (*Id*.). Call-ins while on standby are unpredictable by nature, but Plaintiff and his linemen colleagues were often called into work while

---

[2] Week one: Monday – Thursday 9 hours; week Two: Monday – Thursday 9 hours and Friday 8 hours. (*Id*.).

on standby to restore power in the community. (Plaintiff Dep., RE 17-1, Page ID # 106, 107, 112). Due to the nature of the work, an employee assigned standby can potentially work for more than 24 hours straight at any one time, and Plaintiff estimates he worked these 24-hour shifts over 400 or 500 times during his employment. (Plaintiff Dep., RE 17-1, Page ID # 108-109).

Beyond scheduled standby weeks, employees in Plaintiff's department were also subject to mandatory overtime during an "off week" in the event of a catastrophic event requiring more hands than just those scheduled for standby. Thus, the amount of overtime worked as a bucket foreman (or any lineman) was largely unpredictable. (Plaintiff Dep., RE 17-1, Page ID # 119). Given the nature of Newport's business (timely restoring power to the community), working extended hours was an essential function of a bucket foreman position. (Plaintiff Dep., RE 17-1, Page ID # 120, 138-141). Additionally, bucket foremen were required to report for overtime work on very short notice - 30 minutes or less in an emergency. (*Id*.).

### B.    Plaintiff Suffers from an Unpredictable Seizure Condition that Threatened the Safety of Himself and Others at Work.

Plaintiff began to experience episodes of what he called "stare seizures" during his employment. (Plaintiff Dep., RE 17-1, Page ID # 121). Plaintiff said these seizures caused him to be unconscious or mentally altered for a brief period and unaware of his surroundings. (Plaintiff Dep., RE 17-1, Page ID # 121). Additionally, these episodes were unpredictable, and Plaintiff could not tell when they were

4

coming or how long they would last. (Plaintiff Dep., RE 1701, Page ID # 124). These episodes began in 2014, but Plaintiff did not report them to Newport. (Frisbee Dep., RE 17-2, Page ID # 235).

In March 2020, Plaintiff was driving a bucket truck with lineman Brandon Jenkins. (Plaintiff Dep., RE 17-1, Page ID #122). While driving the truck, Plaintiff lost consciousness for over a minute, and the truck he was driving swerved out of its lane. (Plaintiff Dep., RE 17-1, Page ID #123; Woods Dep., RE 17-3, Page ID # 241). Concerned about his safety, Jenkins immediately reported the incident to their supervisor, Kevin Woods, when they returned to the facility. (Woods Dep., RE 17-3, Page ID #241; Plaintiff Dep., RE 17-1, Page ID # 130-132). Woods was also deeply concerned about the incident and instructed Plaintiff to see his doctor concerning his ability to work. (Woods Dep., RE 17-3, Page ID # 242). Plaintiff saw his primary provider – Dr. Conway – who gave him a note stating he was able to return to work. (Complaint, RE 1-2, Page ID # 10). However, Dr. Conway also advised that Plaintiff was undergoing evaluation from a specialist regarding "some health issues." (*Id.*) Woods was satisfied with Dr. Conway's response at the time and put Plaintiff back on the schedule. (Woods Dep., RE 17-3, Page ID # 242).

But only four months later, on August 6, 2020, Plaintiff suffered another incident at work that posed a grave danger to himself and his crew. While working a standby week, a journeyman lineman looked down from the bucket where he was

working and saw Plaintiff face down on the ground unconscious. (Frisbee Dep., RE 17-2, Page ID # 196-197; Plaintiff Dep., RE 17-1, Page ID # 133). A "mayday" alert was called, and Plaintiff was taken by ambulance to the local hospital. (*Id*.). Plaintiff was purportedly diagnosed with having suffered a heat syncope. (Frisbee Dep., RE 17-2, Page ID # 197). Connie Frisbee ("Frisbee"), Newport's Vice President of Human Resources, knew from other return-to-work slips over the years that Plaintiff had experienced similar episodes outside of work[3] for which he was seen by Dr. Conway. She was also aware that following the March incident, Dr. Conway had referred Plaintiff to a specialist. (Complaint, RE 1-2, Page ID # 10). Given the cumulative nature of these serious incidents and the proximity in time of the last two incidents, Frisbee was concerned about Plaintiff's ability to safely perform this dangerous job. (Frisbee Dep., RE 17-2, Page ID # 209).

## C. Concerned about Plaintiff's Ability to Safely Perform His Job, Newport Refers Him to a Fitness for Duty Examination.

After Plaintiff experienced two serious medical events at work close in time, Frisbee was concerned about the safety of Plaintiff and his co-workers given the inherent dangers associated with their work. (Frisbee Dep., RE 17-2, Page ID # 199, 209). As a result, Frisbee told Plaintiff she was concerned for his health and his safety

---

[3] Plaintiff reported to Newport's workers' comp carrier that he had episodes of this nature on April 7, 2014, June 23, 2014, August 28, 2018, April 2, 2019, November 3, 2019, and the two on the job episodes in March and August 2020. (Frisbee Dep., RE 17-2, Page ID # 235).

and that she was referring him to another medical provider for evaluation. Frisbee sent Plaintiff to Dr. Marilyn Bishop, an occupational physician. (Frisbee Dep., RE 17-2, Page ID # 200).

Because Plaintiff was out of work for three days following the August 6 incident, Frisbee initiated the Family Medical Leave process ("FML"). (Frisbee Dep., RE 17-2, Page ID # 198-199, 222-229). When an employee misses more than three days for a medical event, or if they are seen at a hospital, it is Newport's practice to initiate the FML process.  (Frisbee Dep., RE 17-2, Page ID # 198-199). Dr. Conway filled out the FML paperwork and placed Plaintiff off from work from August 6, 2020, to September 10, 2020.  (*Id.*). Plaintiff was also restricted from anything that involved "exertion." (Plaintiff Dep., RE 17-1, Page ID # 226-229).

On September 23, Dr. Conway sent Newport another letter advising that Plaintiff was evaluated by a neurologist and was not yet released to return to work. (Plaintiff Dep., RE 17-1, Page ID # 142). Dr. Conway anticipated Plaintiff could return to work in mid-October. Moreover, citing that sleep deprivation and/or physical exhaustion precipitated the seizure episodes, he stated that when Plaintiff returned, he would be restricted from working more than 12 hours a day and 55 hours a week. (*Id.*). Based on these medical opinions restricting him from working the essential functions of his job, Plaintiff remained on approved FMLA leave through October 2020.

Dr. Conway released Plaintiff to return to work on October 22, 2020, with a restriction that prohibited him from working more than 12 hours a day.[4] (Frisbee Dep., RE 17-2, Page ID # 230-231). Frisbee understood this restriction to also cap Plaintiff's work hours at 55 per week, consistent with his prior recommendation. (Frisbee Dep., RE 17-2, Page ID # 203). Thereafter, Frisbee contacted Dr. Bishop's office to determine the status of her evaluation with Plaintiff. (Frisbee Dep., RE 17-2, Page ID # 205). Frisbee learned that Plaintiff was supposed to meet with Dr. Bishop on October 6, but that he did not show up for his appointment (Frisbee Dep., RE 17-2, Page ID # 204, 230-231).

Dr. Bishop saw Plaintiff on November 6, 2020, and issued her report. She restricted Plaintiff from operating any company vehicle requiring a CDL for five months. (Plaintiff Dep., RE 17-1, Page ID # 143-144; Frisbee Dep., RE 17-2, Page ID # 207). She also prohibited Plaintiff from working more than 12 hours in a day and 55 hours in a week – the same as Dr. Conway's restriction. (*Id*.). Finally, Dr. Bishop recommended Plaintiff be placed on medical leave for five months and reevaluated at its conclusion. (*Id*.) Frisbee discussed Dr. Bishop's restrictions and Dr. Conway's return to work note with Woods and Curtis Williamson, Newport's

---

[4] Note that Dr. Conway also limited Plaintiff from lifting more than 20 pounds. Plaintiff's job required him to lift more than 50 and 100 pounds. (Plaintiff Dep., RE 17-1, Page ID # 147-148).

Electric Manager, and whether Plaintiff could be accommodated. (Frisbee Dep., RE 17-2, Page ID # 201). They concluded that a 12-hour-per-day and/or 55-hour-per-week work restriction and a prohibition from operating a CDL vehicle could not be accommodated. (Frisbee Dep., RE 17-2, Page ID # 208; Woods Dep., RE 17-3, Page ID # 243, 244). Standby, overtime, and being able to operate a bucket truck are all essential functions of Plaintiff's position. (*Id.*; Frisbee Dep., RE 17-2, Page ID # 202, 205). Thus, Frisbee informed Plaintiff on November 9, 2020, of his eligibility for extended medical leave[5]. (*Id.*; Plaintiff Dep., RE 17-1, Page ID # 143-144).

### D.    Plaintiff Applies For and Is Granted Long-Term Disability Benefits.

Once an employee has missed 90 days of work due to a medical condition, Newport sends the employee paperwork about his eligibility for long-term disability benefits and invites the employee to apply. (Frisbee Dep., RE 17-2, Page ID # 206). After Plaintiff missed 90 days of work and was approved for additional extended medical leave, Frisbee sent him the eligibility letter on November 9, 2020 (Plaintiff Dep., RE 17-1, Page ID # 143-144).

Plaintiff applied for disability benefits in November 2020. (Plaintiff Dep., RE 17-1, Page ID # 145-148). In support of one of his applications during the process,

---

[5] By this time Plaintiff had exhausted his 12 weeks of protected FML. This extended leave of absence was granted in addition to his FML leave and was an accommodation under the ADA.

9

Plaintiff submitted a March 2021 report prepared by his neurological provider – Dr. Arvo Kanna – who noted Plaintiff's condition as "complex partial seizures with impairment of consciousness." (Plaintiff Dep., RE 17-1, Page ID #  134, 149-155). Dr. Kanna's report reflects that Plaintiff was prohibited from driving **any** commercial vehicle requiring a CDL and that these conditions leading to his restrictions could last more than two years. (Plaintiff Dep., RE 17-1, Page ID # 149-155). He also restricted Plaintiff from working more than 16 hours in a day and required Plaintiff to have at least eight hours off from work if he worked 16 hours the previous day.  He also prohibited Plaintiff from working more than 32 hours of overtime during a week.  (*Id*.) In support of his disability benefits, Plaintiff's counsel stated that Plaintiff was not capable of performing this job based on the advice of medical professionals and thus had not been released to work. (Plaintiff Dep., RE 17-1, Page ID # 147-148, 159-179).

In addition to submitting medical documentation to support his claim for disability benefits, Plaintiff also filled out a disability questionnaire where he answered whether he could complete certain activities for himself. (Plaintiff Dep., RE 17-1, Page ID #  180-190). Plaintiff truthfully completed the questionnaire. (Plaintiff Dep., RE 17-1, Page ID # 137). This questionnaire demonstrates that Plaintiff was suffering from a serious medical condition that restricted him from safely performing an inherently dangerous job. Specifically, Plaintiff stated that he

was restricted by his neurologist from operating any commercial vehicle requiring a CDL license. (Plaintiff Dep., RE 17-1, Page ID # 182).

### E.     Plaintiff's Medical Providers Determine He Cannot Perform the Essential Functions of His Job.

In April 2021, Plaintiff was reevaluated by Dr. Bishop. As a result of that appointment and an evaluation of all of Plaintiff's other medical treatment (including his visits to neurologist Dr. Kanna), Dr. Bishop prohibited Plaintiff from working more than 40 hours in a week.  (Plaintiff Dep., RE 17-1, Page ID # 156). Plaintiff was also prohibited from taking **any** standby work. (Plaintiff Dep., RE 17-1, Page ID # 156). In her visit notes, Dr. Bishop reviewed a more robust history of the "episodes" that placed Plaintiff and others in dangerous situations. (Frisbee Dep., RE 17-2, Page ID # 233). She noted that Plaintiff had been on medication for his condition for six weeks and that this dosage reduced his episodes. (*Id*.). Based on this observation, she concluded that, in addition to the hour restriction, "for him to operate with CDL, he should not exceed 40 hours of weekly duty and have no standby duties." (*Id*.).

Frisbee discussed Dr. Bishop's revised restrictions with Woods and Williamson.  (Frisbee Dep., RE 17-2, Page ID # 208). Because the essential functions of the bucket foreman position are to be able to work overtime with 30 minutes' notice and be available for standby work, all three determined there was no reasonable way to accommodate Plaintiff's restrictions. (*Id*.; Williamson Dep., RE

17-4, Page ID # 247; Woods Dep., RE 17-3, Page ID # 243-244). Based on these restrictions, Newport determined that 1) Plaintiff could not safely perform his job without posing a direct threat of harm to himself or others; and 2) it could not accommodate these restrictions that limited him from performing the essential functions of his job.

### F. Newport Cannot Reasonably Accommodate Plaintiff's Restrictions and He Retires.

Because Newport could not reasonably accommodate Plaintiff, Frisbee advised Plaintiff in May 2021, that he had the option to voluntarily retire instead of termination. (Plaintiff Dep., RE 17-1, Page ID # 157-158). Plaintiff retired from Newport. (Plaintiff Dep., RE 17-1, Page ID # 135-136).

At the time Plaintiff was offered the option to accept his retirement eligibility, Newport preemptively reviewed available positions within the organization. (Plaintiff Dep., RE 17-1, Page ID # 157-158; Frisbee Dep., RE 17-2, Page ID # 210-219). At the time, there were only four positions available. Two lineman positions, one wastewater maintenance position, and one customer service position. (Frisbee Dep., RE 17-2, Page ID # 211). Plaintiff could not perform the lineman positions safely, and the wastewater position similarly required mandatory overtime and standby work – an essential function that Plaintiff could not perform with his restrictions. Finally, the customer service position also required mandatory overtime

and Plaintiff did not have the qualifications or experience for a computer-based customer service position. (Frisbee Dep., RE 17-2, Page ID # 212, 216).

### G.   Plaintiff Continues to Suffer from Unpredictable Seizures Even Since his Retirement.

Since retiring from Newport, Plaintiff testified he has experienced approximately 10 more seizures at random times. (Plaintiff Dep., RE 17-1, Page ID # 125). They last from a few seconds to a full minute. (Plaintiff Dep., RE 17-1, Page ID # 126). Plaintiff believes he cannot currently drive a commercial vehicle for "his safety."  (Plaintiff Dep., RE 17-1, Page ID # 129). Plaintiff's medical providers believe his condition is lifelong.  (Plaintiff Dep., RE 17-1, Page ID # 128).

## SUMMARY OF THE ARGUMENT

The District Court did not err in determining that Smith could not proceed with his claims under the Americans with Disabilities Act.[6] The undisputed material facts reviewed by the Court below plainly demonstrated Plaintiff posed a direct threat to the safety of himself and others at Newport and that he was under medical restrictions that precluded him from performing his essential job functions. For these reasons, he could not be reasonably accommodated.  In addition, there were no other

---

[6] Smith likewise sued for damages under the Family Medical Leave Act. Those claims were dismissed by the District Court and are not the subject of Smith's Appeal here. (*see* p. 10 of Appellant Brief, Statement of Jurisdiction).

available positions Plaintiff was qualified to perform with or without a reasonable accommodation at the time he retired in May 2021.

Plaintiff worked as a bucket foreman for Newport, repairing downed powerlines and performing other maintenance related to electrical services for the community. The nature of his work was extraordinarily dangerous and required working unpredictable hours, in unpredictable and hazardous conditions, and around and with live electrical lines. After a 30-plus year career, Plaintiff began to suffer from unpredictable seizure episodes[7] that rendered him unconscious[8] and unresponsive for sometimes over one minute at a time. Plaintiff suffered at least two medical events at work in 2020 that prompted Newport to grow concerned for his safety and others and refer him for a Fitness for Duty Exam. Initially, Plaintiff was given work-hour restrictions, was prohibited from driving a commercial vehicle, and recommended for medical leave. Newport gave Plaintiff his protected family leave and more. Because medical physicians opined that his seizure condition was exacerbated by working long hours and lack of sleep, Plaintiff was later placed on restrictions that limited his ability to perform stand-by work and capped his number of overtime hours and the number of hours he could work in a day and a week. Based

---

[7] The diagnosis from his neurologist was "complex partial seizures with impairment of consciousness." (Plaintiff Dep., RE 17-1, Page ID # 149-155).

[8] His medical providers described this as periods of "brief altered awareness." (Plaintiff Dep., RE 17-1, Page ID # 149-155).

upon these restrictions, Newport determined that 1) Plaintiff was unable to safely perform his job within these restrictions, and 2) he was unable to perform the essential functions of his position. As a result, Plaintiff retired in May 2021 and received his vested retirement benefits from Newport.

The undisputed facts reviewed by the District Court demonstrate that Newport relied on competent medical information and knowledge of its workplace to determine that Plaintiff could not perform his work without posing a direct threat of harm to himself or others. Moreover, the undisputed facts demonstrate that the nature of Plaintiff's work required both overtime *and* standby work. Additionally, Plaintiff was never released to return with restrictions that could be reasonably accommodated in a utility setting. For these reasons and based on the sound judgment of the District Court, there is no disputed issue of fact for a jury to consider and the District Court's ruling should be affirmed.

## **ARGUMENT**

### A. **The District Court Appropriately Concluded that Plaintiff Posed a Direct Threat of Harm to Himself and Others.**

To prevail under his Americans with Disabilities Act claim, a plaintiff must show that he is "otherwise qualified" for the job at issue. *See Doe v. Univ. of Md. Med. Sys.,* 50 F.3d 1261, 1266 (6th Cir. 1995). A person is "otherwise qualified" if he or she can perform the essential functions of the job in question. *See Bradley v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 924 (5th Cir.1993). A disabled

individual, however, is not "qualified" for a specific employment position if he or she poses a "direct threat" to the health or safety of others which cannot be eliminated by a reasonable accommodation. *See* 42 U.S.C. § 12111(3). "The ADA provides that a disabled individual is not 'qualified' for a specific employment position if he poses a 'direct threat' to the health or safety of others that cannot be eliminated by a reasonable accommodation." *Holiday v. City of Chattanooga*, 206 F.3d 637, 648 n. 4 (6th Cir. 2000).

Four factors are to be considered in a direct-threat analysis: (i) the duration of the risk, (ii) the nature and severity of the potential harm, (iii) the likelihood that the potential harm will occur, and (iv) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *Est. of Mauro By & Through Mauro v. Borgess Med. Ctr.,* 137 F.3d 398 (6th Cir. 1998). Concerning the risk presented, "[a]n employer ... is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e. high probability, of substantial harm; a speculative or remote risk is insufficient." *Id*.

Concerning the employer's evaluation of an employee's direct-threat risk, "the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question." *Holiday*, 206 F.3d at 643. In addition, the risk

assessment must be based on "medical or other objective evidence." *Bragdon v. Abbott*, 524 U.S. 624 (1998). *See also* 29 C.F.R. § 1630.2(r) ("This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."). Courts are to assess the objective reasonableness of the views of the employer and/or the employer's medical professionals who made the direct threat decision. *Bragdon*, 524 U.S. at 650.

Applying these standards, courts of appeals have affirmed summary judgment in favor of a defendant where the record evidence demonstrated that the plaintiff was a direct threat in his workplace. In *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, 12–13 (6th Cir. 2012), this Court took an exhaustive analysis of direct threat decisions that resulted in determining an employee was not qualified under the ADA. Take for example, the cases it considered. In *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447–48 (11th Cir. 1996), *cert. denied*, 519 U.S. 1118 (1997), the Eleventh Circuit explained that an epileptic worker with a significant risk of seizures on the job who worked close to fast-moving and high-temperature machinery was a direct threat. The court rejected the worker's argument that there was no actual risk of harm if he followed instructions and worked "downstream" from the equipment. *Id.* at 448. Similarly, in *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 886–87 (9th Cir. 2001), a diabetic plaintiff who operated the equipment that produced,

stored, and transferred liquid chlorine had experienced hypoglycemic episodes where he could not communicate for a while and was sometimes lightheaded. This Court recognized the plaintiff lost consciousness only once in his lengthy tenure and that the potential for harm was small because of the safety features of the equipment he used. *Id*. at 893–94. However, the court concluded that the plaintiff still posed a significant risk under the direct-threat framework, noting the plaintiff's history and the fact that "a significant physical or mental lapse by [plaintiff] as a result of a diabetic episode could result in substantial harm to his co-workers and others." *Id*. at 894.

Finally, in *Darnell v. Thermafiber, Inc*., 417 F.3d 657, 661 (7th Cir. 2005), the Seventh Circuit concluded that a plaintiff with uncontrolled diabetes and a resulting risk of passing out on the job presented a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift 80–pound pieces of fiberboard in a hot environment. The court reached this conclusion despite the plaintiff's arguments that the single doctor who evaluated him was not thorough enough and that he had worked at the plant for ten months without incident. *Id*. at 660, 662.

    i.    *Newport Reasonably Determined that Plaintiff Posed a Direct Threat that Could not Be Eliminated by Reasonable Accommodation.*

The record evidence reviewed by the District Court was clear that Newport engaged in a sufficient process, and that the conclusions it reached were objectively

reasonable based on Plaintiff's medical condition, the input of several medical physicians, and an understanding of the dangerous nature of his work. *Hutton*, 273 F.3d at 891–94 ("individualized assessment of each factor" had occurred in a case where company had the input of several physicians who had examined plaintiff and information about the plant atmosphere and plaintiff's job duties). Thus, the remaining question is whether these conclusions about Plaintiff's condition meet the standard for posing a direct threat. Applying the four-part standard of *Mauro* and 29 C.F.R. § 1630.2(r), the District Court appropriately concluded that Newport determined Plaintiff posed a direct threat to himself, his co-workers, and the public. (Memorandum Opinion and Order, RE 31, Page ID # 610).

Concerning the first factor – duration of risk – the medical evidence and Plaintiff's testimony demonstrate that Plaintiff's condition is unpredictable and life-long[9]. (Plaintiff Dep., RE 17-1, Page ID # 128). Plaintiff experienced an incident related to his condition that immediately placed himself and another co-worker in imminent danger in March 2020. Moreover, Smith's medical providers admitted they could not control or predict his condition and there was no indication that it would resolve in the short term. (Plaintiff Dep., RE 17-1, Page ID # 143-144, 149-

---

[9] While true that his doctors initially opined that perhaps his condition was exaggerated by his working hours and conditions, Plaintiff testified that he still (three years after working for Newport) experiences episodic seizures where he loses consciousness. (Plaintiff Dep., RE 17-1, Page ID # 125, 128).

155). Finally, when Dr. Bishop issued her restrictions in April 2021, she did not indicate that they were temporary and instead concluded that Plaintiff could only safely operate commercial vehicles and safely perform the essential functions of his job if he worked a limited schedule. (Plaintiff Dep., RE 17-1, Page ID # 156).

For the second factor – the nature and severity of potential harm – losing consciousness after suffering a seizure while working around or with live electrical wires or operating a bucket truck could cause catastrophic injury and/or death to Plaintiff, his co-workers, or the public. This Court in *Wurzel* concluded that "were plaintiff to suffer a spasm while driving a tow motor or working alone in proximity to moving machinery or at a height from which a fall could cause injury, the consequences for his own well-being and others can hardly be disputed." *Wurzel* 482 F. App'x 1, 12–13 (6th Cir. 2012). This case presents an even *more* extreme possibility of harm, and it cannot be disputed that Newport had a strong reason to believe that the nature of Plaintiff's condition could expose its workforce or others to imminent danger.

Concerning the third and fourth factors – likeliness and imminence of harm – Plaintiff focuses solely on the fact that he never had a catastrophic accident while at work and that he was released by his physicians to return to work with only a restriction on his work hours. But these arguments did not sway the Court below and they should not be here either. The fact that Plaintiff never suffered a catastrophic

accident is of no matter.  The standard is not that tragedy must strike before an employer can act to protect its workforce. Moreover, Plaintiff admits he has no way of knowing when a seizure is about to happen, making its likelihood unpredictable and potentially imminent. (Plaintiff Dep., RE 17-1, Page ID # 124). Although Plaintiff's providers were willing to permit him to return to work with reduced hours than he was currently working, they likewise noted that his episodes may be triggered by work and stress – two things that Plaintiff admits are highly likely as a bucket foreman working in dangerous and unpredictable conditions. (Plaintiff Dep., RE 17-1, Page ID # 138-141, 143-144). As someone who worked close to dangerous powerlines, climbed electrical poles and worked in a 2-man team requiring high levels of awareness and focus for the safety of all in their general vicinity, Plaintiff's job environment certainly falls in the objectively dangerous category. (Plaintiff Dep., RE 17-1, Page ID # 138-141). When also considering that Plaintiff on two occasions suffered a medical event at work that resulted in an employee report and a mayday call, the factors concerning likelihood and imminence of harm are unmistakably met. It is only by luck that no one suffered injury during these events.

Finally, there was no reasonable accommodation Newport could provide Plaintiff that could eliminate this direct threat of harm. The District Court concluded that the essential functions of Plaintiff's position were directly in conflict with his medical condition and could not be accommodated in a way that would allow him

to work. (Page ID 611). Plaintiff's position as a bucket foreman required him to climb electrical poles, be extended at high altitudes, and work with live electrical wires. (Plaintiff Dep., RE 17-1, Page ID # 138-141). Leaving aside the hour restrictions placed on Plaintiff by various medical providers, the fact that he could experience an unconscious episode *at any time* reasonably rendered him unsafe for his position as a lineman. Additionally, and as addressed more thoroughly in Section II here *infra*, Plaintiff's position necessitated long and/or, unpredictable hours, and standby work. Plaintiff's providers opined that his condition was exacerbated by lack of sleep and stress. (Plaintiff Dep., RE 17-1, Page ID # 142). There is no reasonable accommodation Newport could provide Plaintiff that would either eliminate these factors or permit him to work a steady 40-hour-per-week schedule. Because there was no way to reasonably accommodate Plaintiff's direct threat of harm to himself or others, Newport reasonably determined he could not safely perform his job.

For the above reasons, the District Court appropriately concluded that Plaintiff is precluded as a matter of law from pursuing his ADA claims any further as he was not "otherwise qualified" under the statute.

## B. Newport Could Not Reasonably Accommodate Plaintiff's Restrictions.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). The statute defines "discriminate" to include "not making reasonable accommodation to the

known physical ... limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." *Id*. § 12112(b)(5)(A). An "otherwise qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8). *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014). For the reasons addressed above, Plaintiff was not "otherwise qualified" due to the direct threat he posed to the safety of himself and others because of to his condition. But assuming *arguendo* Plaintiff was otherwise qualified for his position with Newport, it still could not reasonably accommodate him and his medical restrictions.

To provide a reasonable accommodation, an employer may be required to modify the responsibilities of a disabled employee's existing job or transfer the employee to a vacant position with different responsibilities. *See* 29 C.F.R. § 1630.2(o); *Kleiber v. Honda of Am. Mfg., Inc*., 485 F.3d 862, 870 (6th Cir. 2007). If an employee seeks to stay in his or her current job, as Plaintiff argues here, the term reasonable accommodation means: "Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the *essential functions* of that position." 29 C.F.R. § 1630.2(o)(emphasis added).

*i.      Overtime and Standby Work are Essential Functions of Plaintiff's Job.*

It is well-settled law that a suggested accommodation is not reasonable if it requires eliminating an "essential" function of the job. 42 U.S.C. § 12111(8).[10] Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires. The term ... does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered essential because (1) the position exists to perform the function, (2) a limited number of employees are available that can perform it, or (3) it is highly specialized. *Id*. § 1630.2(n)(2). Two factors are "the employer's judgment as to what functions of a job are essential" and an employer's "written description" of the job. 42 U.S.C. § 12111(8). The regulations accompanying the ADA also direct a court to consider five additional factors:

(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(iii)-(vii).

---

[10] The same goes for the EEOC's regulations. They define essential functions as those that are "fundamental" (as opposed to "marginal"), 29 C.F.R. § 1630.2(n)(1), so that a job is "fundamentally alter[ed]" if an essential function is removed. 29 C.F.R. § Pt. 1630(n), App. at 394. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015).

Here, it is undisputed that Plaintiff's position required unpredictable hours, overtime hours, and standby work. (Plaintiff Dep., RE 17-1, Page ID # 138-141). Plaintiff's written job description and the testimony of numerous fact witnesses, including Plaintiff, confirm this. (*Id.*; Woods Dep., RE 17-3, Page ID # 243-244; Williamson Dep., RE 17-4, Page ID # 247; Frisbee Dep., RE 17-2, Page ID # 201, 220-221; Denton Dep., RE 17-5, Page ID # 250-251; Plaintiff Dep., RE 17-1, Page ID # 106-110). The nature of Plaintiff's work centered on him restoring power to his community during outages or other emergencies. (Plaintiff Dep., RE 17-1, Page ID # 138-141). Plaintiff was one of just *three* bucket foremen and he worked on one of only two small bucket trucks. (Frisbee Dep., RE 17-2, Page ID # 195). It is similarly undisputed that Plaintiff worked extensive overtime during his employment and oftentimes would be required to work 24 hours around the clock to complete his work. (Plaintiff Dep., RE 17-1, Page ID # 108-110). The work hours and requirements placed on linemen are not a "marginal" function of their job that can be rearranged or accommodated. On the contrary, overtime work and/or an unpredictable schedule is a necessity that cannot reasonably be altered.

Plaintiff worked on a two-man team where everyone assigned to his truck was required to possess a CDL license and must be able to operate the truck in the event of an emergency. (Plaintiff Dep., RE 17-1, Page ID # 111). Additionally, Plaintiff's prohibition on working more than 40 hours per week would necessarily impact his

other co-workers. Imagine for instance that Plaintiff and his assigned teammate are responding to a power outage 45 minutes away from the main facility. Plaintiff receives the call to respond on hour 36 of his 40-hour work week. Once Plaintiff arrives at the outage, he and his teammate get to work to restore power by operating the bucket truck and climbing to high altitudes to repair the outage. Four hours into the job, Plaintiff hits his 40-hour limit and must cease work to continue to meet his restrictions and thus safely perform his job. Plaintiff testified that he could not reasonably leave his assignment mid-way through it. And he also testified that he would not do that. This likely hypothetical demonstrates the unreasonable nature of Plaintiff's proposed accommodation and why Newport could not continue to have him work in his dangerous and unpredictable role with his medical restrictions.

ii. *There were no other positions available for which Plaintiff was qualified.*

Plaintiff never requested a transfer as a reasonable accommodation. On the contrary, throughout the interactive process, Plaintiff continued to insist that he be returned to his position as a bucket foreman. Only if a plaintiff's requested accommodation is a transfer to a different position do "employers have a duty to locate [a] suitable position [ ]...." *Kleiber*, 485 F.3d at 870. ". . . to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Id*. "[A]n employer need only

26

reassign the employee to a vacant position." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir.1998).

Not only did Plaintiff not request a transfer as an accommodation, but also missing from his Complaint or the record is any allegation that he was not placed in an identified position for which he was qualified. (RE 1). Moreover, the undisputed record evidence demonstrates that **no other** positions were available in April 2021 that would have met Plaintiff's restrictions or for which he was qualified. At the time Plaintiff's extended medical leave expired and Newport determined it could not reasonably accommodate his 40-hour-per-week work restriction, there were four positions available: Plaintiff's bucket foreman position, a journeyman lineman position, a wastewater maintenance position, and a customer service position. (Frisbee Dep., RE 17-2, Page ID # 210-219). Critically, each of these four positions requires overtime work, standby work, and the availability to appear at work at short notice in the event of an emergency. (*Id.*). Thus, Plaintiff could not perform the essential function of *any* of these jobs based on his existing restrictions, a fact considered by and dispositive for the District Court.

Moreover, Plaintiff could not safely perform either of the lineman positions and did not possess the necessary qualifications to perform either the wastewater position or the customer service position. The wastewater role required training and certification, and the customer service position required experience with computer-

based systems and prior customer service. Plaintiff worked for Newport for over 30 years, and it was well familiar with his prior experience and qualifications. Thus, it is undisputed that Newport did not violate any provision of the ADA by failing to transfer him to a vacant position for which he was qualified.

Finally, Plaintiff's insistence that Newport could have shifted the essential functions of the vacant roles to other employees is without merit. The ADA does not require the shifting of essential functions to other employees as part of any job restructuring accommodation. See 42 U.S.C. § 12111(9)(B); *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013). The undisputed facts remain that Newport's essential business required long shifts, overtime, and mandatory standby work. (Denton Dep., RE 22-5, Page ID # 448, 451; Williamson Dep., RE 17-4, Page ID #247; Frisbee Dep., RE 17-2, Page ID # 210, 216-218). None of the positions open at the time of Plaintiff's requirement met his qualifications and Newport could not accommodate his restrictions.

### C.    Newport Engaged in a Sufficient Interactive Process.

Even though Plaintiff did not plead in his Complaint any independent failure by Newport to engage in an interactive process, Newport sufficiently engaged in the interactive process with Plaintiff.  There is no genuine dispute of fact as to whether Newport participated in "good faith" in an "individualized inquiry" to determine whether it could accommodate Plaintiff's disability. *Rorrer v. City of Stow*, 743 F.3d

1025, 1045 (6th Cir. 2014). To the contrary, and as determined by the District Court, Newport placed Plaintiff on leave while it determined whether he could safely perform his position and engaged in an *individualized inquiry* into his ability to work. (Memorandum Opinion and Order, RE 31, Page ID # 613). During Plaintiff's leave, Frisbee had a conversation with Plaintiff about his Fitness for Duty examination and his restrictions. Newport reviewed the medical restrictions submitted by Plaintiff's providers, reviewed his Fitness for Duty examination results, and offered him extended medical leave as an accommodation under the ADA. Finally, Newport *reevaluated* Plaintiff after that extended medical leave and engaged in a review of his restrictions in comparison to his job functions. Ultimately, it concluded that it could not accommodate the restrictions on the essential functions of his job. And Newport did not stop there.  Frisbee also looked at other available positions and determined there were no vacancies Plaintiff was qualified to perform. (Frisbee Dep., RE 17-2, Page ID # 210-219; Plaintiff Dep., RE 17-1, Page ID # 157-158). This process is evidence of a good faith effort to comply with the ADA and a sufficient interactive conversation. Plaintiff's issue on appeal – that Newport did not engage in a sufficient enough interactive process – is not the law nor is it supported by the record. (Memorandum Opinion and Order, RE 31, Page ID # 614).

## **CONCLUSION**

Plaintiff worked in a highly dangerous job that required him to be focused and alert and work long hours on short notice. Unfortunately, Plaintiff's seizure condition was not compatible with his position as a utility lineman, and as of August 2020, he could not safely perform the essential functions of his position. Newport engaged in an appropriate interactive process with Plaintiff, and ultimately determined that Plaintiff was a direct threat to himself and others, that it could not reasonably accommodate his medical restrictions, and that he was not qualified for any other vacant positions available at the time. The undisputed record evidence establishes that there are no disputes of any material fact that would permit Plaintiff recovery as a matter of law. For these reasons, this Court must affirm the decision of the District Court in its entirety.

s/Paige M. Lyle
Mark E. Stamelos (TN 021021)
Paige M. Lyle (TN 032959)
FORDHARRISON LLP
150 3rd Avenue South, Suite 2010
Nashville, TN 37201
Telephone: (615) 574-6700
mstamelos@fordharrison.com
plyle@fordharrison.com

## **CERTIFICATE OF COMPLIANCE**

In accordance with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Appellee's brief complies with both type and volume limitations. In accordance with Local Rule 6 Cir. R. 32(a)(4)-(6) of the Sixth Circuit Rules of Appellate Procedure, this brief was prepared using Microsoft Word Version 2016, including a proportionally spaced font with Serifs Times New Roman size 14 font. The total word count for this brief, pages 1 through 30, is 7,396 words.

s/ Paige M. Lyle
_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served via the Court's

CM/ECF system this the 7th day of October 2024, upon:

Jeffrey C. Taylor, Esq. (BPR #013436)
TAYLOR LAW FIRM
365 West Third North Street
Morristown, Tennessee 37814
(423) 586-6812
jeff@taylorlawfirmtn.com

Ben W. Hooper, III
Ben W. Hooper, III, Esq. (BPR #013831)
CAMPBELL & HOOPER
335 East Main Street
Newport, Tennessee 37821
(423) 623-3082
bwh3rd@yahoo.com

*Counsel for Appellant*

s/ Paige M. Lyle

## **ADDENDUM**

Pursuant to 6th Cir. R. 28(b), Appellee designates the following relevant

District Court documents:

| Document | Record | Date | Page ID |
|---|---|---|---|
| Complaint | 1 | 9/19/22 | 1-13 |
| Defendant's Motion for Summary Judgment | 15 | 1/2/24 | 72-74 |
| Defendant's Memo in Support of Motion for Summary Judgment | 16 | 1/2/24 | 75-99 |
| Defendant's Statement of Undisputed Material Facts | 19 | 1/3/24 | 255-266 |
| Defendant's Notice of Filing Exhibits in Support of Motion for Summary Judgment | 17 | 1/2/24 | 100-251 |
| Plaintiff's Response to Statement of Undisputed Material Facts and Statement of Additional Facts | 22-5 | 1/22/24 | 448, 451 |
| Memorandum Opinion and Order | 31 | 4/17/24 | 610, 613, 614 |